1
2
3
4 UNITED STATES DISTRICT COURT
5 NORTHERN DISTRICT OF CALIFORNIA
6 SAN JOSE DIVISION
7

8 SOPHINA PHILIPINA,

Plaintiff,

9

10 v.

11 NANCY A. BERRYHILL,

12 Defendant.

Case No.17-cv-05360-VKD

**ORDER RE CROSS-MOTIONS FOR SUMMARY JUDGMENT**

Re: Dkt. Nos. 19, 20

13

14       Plaintiff Sophina Philipina appeals a final decision by defendant Commissioner of Social

15 Security ("Commissioner") denying her application for supplemental security income ("SSI")

16 under Title XVI of the Social Security Act ("Act"), 42 U.S.C. §§ 1381, *et seq*.  The parties filed

17 cross-motions for summary judgment.  Although she was given an opportunity to do so, Ms.

18 Philipina did not submit a reply.  Pursuant to the Court's orders (Dkt. Nos. 14, 23), each side also

19 submitted statements of the administrative record.  Dkt. Nos. 26-27, 30.  The matter was submitted

20 without oral argument.  Upon consideration of the moving and responding papers, the relevant

21 evidence of record, and for the reasons set forth below, Ms. Philipina's motion for summary

22 judgment is granted, the Commissioner's cross-motion for summary judgment is denied, and this

23 matter is remanded for further proceedings consistent with this order.[1]

24 **I.      STANDARD FOR DETERMINING DISABILITY**

25       A claimant is considered disabled under the Act if she meets two requirements.  First, a

26 claimant must demonstrate an inability "to engage in any substantial gainful activity by reason of

27

28 ───────────────

[1] All parties have expressly consented that all proceedings in this matter may be heard and finally adjudicated by a magistrate judge.  28 U.S.C. § 636(c); Fed. R. Civ. P. 73.

any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 1382c(a)(3)(A). Second, the impairment must be so severe that a claimant is unable to do previous work, and cannot "engage in any other kind of substantial gainful work which exists in the national economy," considering the claimant's age, education, and work experience. *Id.* § 1382c(a)(3)(B).

In determining whether a claimant has a disability within the meaning of the Act, an ALJ follows a five-step sequential analysis:

At step one, the ALJ determines whether the claimant is engaged in "substantial gainful activity." 20 C.F.R. § 416.920(a)(4)(i). If so, the claimant is not disabled. If not, the analysis proceeds to step two.

At step two, the ALJ assesses the medical severity of the claimant's impairments. 20 C.F.R. § 416.920(a)(4)(ii). An impairment is "severe" if it "significantly limits [a claimant's] physical or mental ability to do basic work activities." *Id.* § 416.920(c). If the claimant has a severe medically determinable physical or mental impairment, or a combination of impairments, that is expected to last at least 12 continuous months, 20 C.F.R. § 416.920(d), she is disabled. *Id.* § 416.920(a)(4)(ii). Otherwise, the evaluation proceeds to step three.

At step three, the ALJ determines whether the claimant's impairments or combination of impairments meets or medically equals the requirements of the Commissioner's Listing of Impairments. 20 C.F.R. § 416.920(a)(4)(iii). If so, a conclusive presumption of disability applies. If not, the analysis proceeds to step four.

At step four, the ALJ determines whether the claimant has the residual functional capacity ("RFC") to perform her past work despite her limitations. 20 C.F.R. § 416.920(a)(4)(iv). If the claimant can still perform past work, then she is not disabled. If the claimant cannot perform her past work, then the evaluation proceeds to step five.

At the fifth and final step, the ALJ must determine whether the claimant can make an adjustment to other work, considering the claimant's RFC, age, education, and work experience. 20 C.F.R. § 416.920(a)(4)(v). If so, the claimant is not disabled.

The claimant bears the burden of proof at steps one through four.  The Commissioner has the burden at step five.  *Bustamante v. Massanari*, 262 F.3d 949, 953-54 (9th Cir. 2001).

## II.     BACKGROUND

Ms. Philipina was born in 1969 and was 47 years old at the time the ALJ issued the decision under consideration here.  Ms. Philipina reported suffering mental and physical abuse as a child.  She also acknowledged substance abuse, including an addiction to methamphetamines for 14 years, but reported that she stopped all drug and/or alcohol abuse sometime around March 2012.  In a Disability Report, Ms. Philipina stated that she completed the 10th grade in high school and indicated that her most recent work activity, spanning the time period 2005 through August 30, 2011, was babysitting her grandchildren, for which she was paid $850.00 per month. AR[2] 322.  On May 31, 2012,[3] Ms. Philipina applied for SSI, alleging disability beginning August 30, 2011 due to depression, anxiety, arthritis in her hand and neck, and memory loss.  *Id*. at 290-98, 321.

### A.     Summary of Medical Records

#### 1.     Treating Physician Dr. Quyen Queen Nguyen, M.D.

Ms. Philipina's primary care physician is Dr. Quyen Queen Nguyen.  Ms. Philipina first saw Dr. Nguyen in March 2009, complaining of neck and shoulder blade pain after a car accident in February 2009.  Dr. Nguyen noted tenderness, asymmetry, restrictions, and texture changes in the left shoulder blade region.  Images of the cervical and thoracic spine showed degenerative disc disease at C3/4 and C5/6, as well as mild degenerative change at T4/5.  *Id*. at 561-563.  Ms. Philipina continued to report neck pain in subsequent visits on September 2, 2009, September 29, 2009, November 3, 2009 and March 2, 2010, but nonetheless stated that she had not followed up with orthopedist Dr. Griffin, as she had been directed to do.  *Id*. at 563-569.  Dr. Nguyen observed that Ms. Philipina had no stiffness in her neck and had full range of motion, assessed osteoarthritis

---

[2] "AR" refers to the certified administrative record lodged with the Court.  Dkt. No. 18.

[3] Although the cited portion of the administrative record indicates that Ms. Philipina's SSI application was dated June 15, 2012 (AR 290), the ALJ and both sides seem to agree that Ms. Philipina's SSI application was filed on May 31, 2012.

(joint pain from wear and tear), and prescribed naproxen, Flexeril, and Celebrex. *Id.* at 563-569.

In visits prior to March 2, 2010, Dr. Nguyen did not note any mental health symptoms or prescribe any psychotropic medications. *Id.* During her March 2, 2010 visit with Dr. Nguyen, however, Ms. Philipina reported feeling stressed, noting that her son and daughter-in-law were incarcerated and that she was now caring for her two grandchildren. Ms. Philipina stated that she was crying all the time, had no appetite, and was unable to sleep. *Id.* at 578. Dr. Nguyen assessed depression and insomnia, prescribed Celexa and Ambien, and recommended that Ms. Philipina seek therapy at a county mental health provider. *Id.*

On February 25, 2011, Ms. Philipina returned to Dr. Nguyen for a follow-up evaluation for depression. Ms. Philipina stated that she lost a prescription and admitted that she never started Celexa or her pain medications. She complained of decreased sleep, interest, concentration, energy and memory, as well as labile moods ("anxious, angry and sad"), but denied any hallucinations. Dr. Nguyen assessed depression and sinusitis, but noted no abnormalities in her physical examination. *Id.* at 482.

Images later taken on June 27, 2012 of Ms. Philipina's hips revealed minimal spurring of the femoral heads bilaterally, no significant degenerative change, and some mild facet hypertrophy of the lower lumbar facets L5-S1 bilaterally. X-rays of her elbows showed possible slight bursitis of the right elbow, but were otherwise unremarkable. Images of her feet revealed minimal degenerative changes of the first metatarsophalangeal joint with slight spurring and valgus of the left first metatarsophalangeal joint. *Id.* at 447-449. In subsequent visits to Dr. Nguyen on June 29, 2012, July 26, 2012 and September 12, 2012, Ms. Philipina did not complain of joint pain. *Id.* at 484, 489, 491.

Following a referral from Dr. Nguyen, Ms. Philipina saw Dr. Timothy Pham, D.P.M. on October 27, 2012 for right heel pain. Dr. Pham's impression was that Ms. Philipina's alleged pain was due to plantar fasciitis and sinus tarsi syndrome in the right foot, plantar verrucae in the right heel, and metatarsalgia in both feet. He gave Ms. Philipina a cortisone injection in her right foot and instructed her to do home exercises. Although Dr. Pham recommended that Ms. Philipina return for a follow-up appointment in one or two months, there is no indication that she returned to

see him. *Id*. at 479.

Meanwhile, Ms. Philipina saw Dr. Nguyen on June 29, 2012, complaining of worsening anxiety. She reported that she was in a shelter and trying to find housing. Dr. Nguyen assessed anxiety, but noted no abnormalities during her physical exam, and suggested that Ms. Philipina return in a month, or sooner, if her condition worsened. *Id*. at 484.

During a November 7, 2012 visit, Ms. Philipina reported that she was receiving mental health treatment and requested a refill of Ativan. She also complained that her clavicle ached, especially at night and with changes in the weather. Dr. Nguyen's report notes prescriptions for Vicodin, Celexa and Ativan. *Id*. at 492. The following month, on December 4, 2012, Ms. Philipina returned to Dr. Nguyen, reporting that her anxiety and insomnia were getting worse and claiming that the medications from her psychiatric provider were not working. Dr. Nguyen assessed depression, anxiety, insomnia, arthritis and noted Ms. Philipina's history of substance abuse. She increased Ms. Philipina's dose of Celexa and added Elavil to her medications. *Id*. at 493.

During a return visit on January 11, 2013 for a follow-up exam, Ms. Philipina reported that she was doing well. *Id*. at 495. However, later that year, on October 18, 2013, Ms. Philipina saw Dr. Nguyen, complaining of lower back pain and paresthesia down both legs that reportedly was worse when Ms. Philipina was walking or sitting. Ms. Philipina reported that Motrin pain medication was not helping. Dr. Nguyen noted paraspinal tissue "TART" (tenderness, asymmetry, restricted motion, and tissue texture changes) that were greater on the left than the right. Dr. Nguyen prescribed Flexeril, Ultram, and Benadryl. Ms. Philipina was referred to a physical therapist and advised to stretch and use heat. *Id*. at 535-36.

On November 27, 2013, Ms. Philipina saw Dr. Nguyen, complaining of dysuria and some lower abdominal pain, and reporting that her depression had not improved. Dr. Nguyen performed a urine dip, assessed a urinary tract infection, prescribed Cipro and Wellbutrin, and recommended that Ms. Philipina drink more fluids. *Id*. at 533-534.

On January 17, 2014, Ms. Philipina returned to Dr. Nguyen with her SSI paperwork, and complained of right ankle pain, left thigh pain and lower back pain. Ms. Philipina also requested

refills of Xanax and Celexa. Dr. Nguyen noted slight tenderness in the umbilical region and assessed abdominal pain "and depression, anxiety, bipolar, schizoaffective." *Id*. at 530. She prescribed Norco, Motrin, Celexa and Ativan. *Id*. at 530-531.

On April 1, 2015, Dr. Nguyen completed a Physical RFC Questionnaire in which she noted Ms. Philipina's diagnoses as "schizoaffective, insomnia, anxiety, chronic pain, Hep C chronic, disc degeneration T3-T4 & herniation." *Id*. at 392. She further noted Ms. Philipina's history of substance abuse, that her condition was affected by depression, anxiety and psychological factors, that her impairments could be expected to last at least 12 months, and that Ms. Philipina was not a malingerer. *Id*. at 393. In Dr. Nguyen's view, Ms. Philipina's symptoms would often interfere with her attention and concentration and that she had moderate limitations in her ability to deal with work stress. *Id*. at 393-394. Dr. Nguyen further noted that Ms. Philipina could walk three to four city blocks without rest; could sit and stand for 30 minutes at a time; could stand/walk for two hours in an eight-hour workday; could sit for at least six hours in an eight-hour workday; needed to walk every 20 minutes for 10 minutes at a time; needed to shift positions at will; needed unscheduled breaks; could frequently lift less than 10 pounds and occasionally lift 10 pounds; could use her hands for 100% of a workday to grasp, twist and turn objects; could use her fingers 100% of a workday for fine finger manipulations; could use her arms 50% of the workday for overhead reaching; and would miss work more than three times per month due to her impairments. *Id*. at 394-396.

## 2. Examining Psychologist Dr. Janine Marinos, Ph.D.

Meanwhile, on March 30, 2010, Ms. Philipina appeared for a psychological evaluation by examining consultant Dr. Janine Marinos, Ph.D. *Id*. at 435-438. Ms. Philipina reported that she had been homeless for three years, could not read or write, and suffered from arthritis and chronic depression. Dr. Marinos noted that Ms. Philipina did poorly on all tests administered; her scores indicated moderate to severe impairments, extremely low/poor abilities, and a full scale IQ of 50. However, Dr. Marinos remarked that Ms. Philipina did not appear motivated to make an adequate effort on testing, and she believed Ms. Philipina was malingering. For example, Dr. Marinos noted that Ms. Philipina did very poorly on a test of memory malingering. Additionally, Dr.

Marinos observed that while Ms. Philipina did not appear distressed during the interview, she would frequently sigh and wipe her brow. Ms. Philipina denied auditory or visual hallucinations, stated that she had not been in therapy or on antidepressant medications, and showed Dr. Marinos a prescription for Celexa that was unfilled. While Ms. Philipina denied a history of substance or alcohol abuse during her interview with Dr. Marinos (*id*. at 435), she would later admit to continued methamphetamine use through approximately March 2012 (*see, e.g.*, *id*. at 521, 605). Dr. Marinos noted that Ms. Philipina's thought processes were linear and goal-oriented, and she questioned whether Ms. Philipina met any of the criteria for a major mood disorder. Dr. Marinos determined that Ms. Philipina's test results were not valid, and ultimately offered no psychiatric diagnosis. Nevertheless, she noted that while Ms. Philipina might have difficulty on jobs requiring more than basic reading and writing skills, "it is likely that she has the capacity to understand, remember, and carry out simple instructions, maintain adequate concentration and pace for routine tasks, and interact appropriately with others. She likely is able to handle simple monetary transactions." *Id*. at 438.

### 3. Treating Physician Dr. Eduardo da Silveira, M.D.

In 2012, following liver tests, Ms. Philipina was diagnosed with hepatitis C. *Id*. at 501. She was referred to gastroenterologist Dr. Eduardo da Silveira, M.D., whom she saw for a consultation on August 1, 2012. Dr. da Silveira noted no prior history of complications from hepatitis C, including jaundice, ascites, previous gastrointestinal bleeding from varices, or encephalopathy. Although Ms. Philipina denied poor appetite, insomnia, hair loss, dizziness and irritation, she did complain of itchiness, loss of energy and fatigue. Dr. da Silveira ordered blood tests and a transabdominal ultrasound. *Id*. at 517-519.

CT scans of Ms. Philipina's abdomen on September 25, 2012, January 31, 2013 and October 16, 2013 revealed that she had an enlarged spleen and liver cirrhosis. *Id*. at 505, 646, 657-659. In view of the risks due to Ms. Philipina's anxiety and depression, however, Dr. da Silveira determined that she was not a good candidate for interferon therapy. Although Ms. Philipina sometimes reported lower abdominal pain, she denied edema in the lower extremities and joint pain, and her physical exams generally revealed no abdominal tenderness or masses and

no joint pain. *Id*. at 495, 511, 514-515, 532-541, 653-654, 658-659. Additionally, during a May 1, 2013 visit, Dr. da Silveira noted that Ms. Philipina's cirrhosis was in compensated status. *Id*. at 659. While he noted that Ms. Philipina might benefit from treatments that may be available in the future, Dr. da Silveira also recommended that she lose weight in order to increase the efficacy of treatment, if she were found to be a good candidate. *Id*. at 515. In his most recent treatment record of a July 9, 2014 examination, Dr. da Silveira also remarked that Ms. Philipina was not very compliant about taking her medications and noted that since her last visit in May 2013, she either cancelled or did not show up for several appointments in the past year. He concluded that Ms. Philipina would "need to demonstrate more adherence to doctor's recommendations" in order to be considered a good candidate for treatment. *Id*. at 653, 657.

### 4. Examining Physician Dr. Robert Tang, M.D.

On September 30, 2012, Ms. Philipina presented for a consultative physical examination with Dr. Tang. Her chief complaint, other than mental health issues, was that her hands cramped. *Id*. at 472. However, Dr. Tang found that Ms. Philipina's bilateral flexion/extension was 70 degrees for the proximal phalanx and 90 degrees for the distal phalanx, and that her fine finger dexterity was intact to alternating finger touch and handling small objects. *Id*. at 474. Dr. Tang further noted that Ms. Philipina had a normal gait and tandem toe-heel walk; her "[r]ange of motion show[ed] full weight-bearing in the legs and axial skeleton with a cervical lumbar spine, hip, knee, ankles, shoulders, elbows, wrists, fingers, thumbs full range of motion and equal bilaterally"; her motor strength and muscle bulk and tone, including grip, was "5/5" for all four extremities; her sensation was intact to light touch on all four extremities, including her hands; her deep tendon reflexes were "2+ in the bilateral upper and lower extremities," and her cranial nerves II-XII were intact. Noting that she was undergoing a liver biopsy that month, and pending a mental health evaluation, Dr. Tang diagnosed Ms. Philipina as a "[g]enerally physically fit claimant" with no physical limitations in her ability to work. *Id*. at 472-475.

### 5. Examining Physician Dr. Nayyar Masood, M.D.

On May 15, 2013, Ms. Philipina presented for a consultative internal medicine examination by Dr. Masood. He noted that Ms. Philipina appeared anxious, restless and

disoriented in time and place, and remarked that she was a poor historian.  *Id*. at 520.
Nevertheless, Dr. Masood observed that she was able to lie down, sit up, and get on and off the
exam table with ease, and that she sat comfortably through the exam.  *Id*. at 522.  He found her
range of motion about the neck and in her upper extremities to be within normal limits.  In her
lower extremities, Ms. Philipina could do a straight leg raise 0 to 45 degrees bilaterally, limited
secondary to pain on the lateral aspects of her hip joints.  She could flex her knees completely,
there was no crepitus, and dorsiflexion and plantar flexion were within normal limits.  Dr. Masood
noted some paraspinous muscle spasm about the lumbar spine, and Ms. Philipina was unable to
walk tandem or on her toes.  However, she could walk briefly on her heels, could make a partial
squat without support, and her gait and posture were normal.  *Id*.  Although Ms. Philipina was
observed to have hand tremors, Dr. Masood noted that she had no history of such symptoms and
posited that the tremors may be due to her anxiety.  *Id*. at 523.  He documented his impressions of
depression and anxiety, with poor memory, noting that Ms. Philipina was momentarily tearful
during the exam and tended to sob; hepatitis C with cirrhosis and symptoms of fatigue;
generalized joint pains, likely musculoskeletal; vitamin D deficiency; and exogenous obesity.
Stating that Ms. Philipina's psychiatric condition was beyond the purview of his exam, Dr.
Masood concluded that Ms. Philipina could stand and walk for six hours in an eight-hour
workday, with usual breaks; sit for up to six hours in an eight-hour workday, with usual breaks;
and using both hands, she could lift, push, or pull up to 10 pounds frequently and 20 pounds
occasionally to mid-chest level.  He found no problems with fine finger and hand movements.  *Id.*

### 6.    East Valley Behavioral Health Center

In July 2012, Ms. Philipina began receiving mental health therapy and medication
management services at East Valley Behavioral Health Center.  In a July 25, 2012 initial
psychological assessment with Wendy Liang, a Licensed Clinical Social Worker, Ms. Philipina
reported racing thoughts, lots of worries and high levels of anxiety on a daily basis.  She also
noted crying spells, difficulty falling asleep and getting out of bed, and being forgetful and easily
irritated.  Ms. Philipina stated that she had difficulty being around people because she felt that
they are watching, following and talking about her, and had daily paranoia, thinking that people

were going to hurt her. She denied visual hallucinations or delusions, but indicated that she sometimes heard voices. Ms. Philipina further reported being clean from methamphetamines for four months after being heavily addicted for 14 years. *Id*. at 605. Ms. Liang observed that Ms. Philipina's hygiene and grooming were good; her mood was sad and stressed, and her affect was tearful at times. Ms. Philipina's speech was within normal range, and Ms. Liang noted that she was a good historian, had fair insight and judgment, and was alert, coherent, and cooperative during the session. *Id*. at 606. Further, Ms. Liang found Ms. Philipina to be goal-oriented, noting that Ms. Philipina stated a desire to apply for disability. *Id*. Ms. Liang diagnosed Ms. Philipina with major depressive disorder with psychotic features, polysubstance abuse and amphetamine dependence. *Id*.

When Ms. Philipina appeared for a medication management visit with Dr. Syed Afroz, M.D. on September 26, 2012, she reported being compliant with her medications and feeling a little tired, but otherwise feeling okay. She stated that she found an apartment and reported improvement in her overall functioning, sleep, appetite, energy and self-care. Ms. Philipina stated that she rode her bike around town and attended church on Sundays. She denied drug or alcohol abuse for the past six months and denied behavioral acting out, but she complained of anxiety, stress, some trouble sleeping, and an ongoing fear of being hurt in her home by intruders. Dr. Afroz observed that Ms. Philipina was alert, oriented, cooperative, and in no apparent distress; her thoughts were concrete, coherent and relevant; she had regular rhythm and rate of speech, normal psychomotor activity and good eye contact; her insight, judgment and impulse control were adequate; and she had no overt active psychotic symptoms and no suicidal or homicidal ideations. Dr. Afroz increased Ms. Philipina's Risperdal dose and recommended that she return in six weeks. *Id*. at 610.

When Ms. Philipina returned to Dr. Afroz on November 7, 2012, she stated that she had not been taking Risperdal due to an inability to get the medication from the pharmacy. She reported increased depression, crying, and paranoia, and noted that she occasionally heard voices and saw images. Ms. Philipina stated that she was distressed after learning that she had 60% liver capacity because of her hepatitis C, and she had problems with insomnia due to worries and not

taking her medications. Dr. Afroz noted that Ms. Philipina was "loud," had some mild psychomotor restlessness, and that her mood was stressed and her affect labile. Nevertheless, he found that she was alert and oriented; her thoughts were coherent and relevant; she had good eye contact and adequate insight, judgment and impulse control; and she had no overt active psychotic symptoms or paranoia, no gross cognitive deficits, and no suicidal or homicidal ideations. *Id*. at 612.

When Ms. Philipina saw Dr. Afroz on January 3, 2013, she reported being depressed, forgetful, and that she was crying, having trouble sleeping and experiencing a lot of mood swings. Dr. Afroz noted that her medications compliance was poor, and her pharmacy profile indicated that she had not been taking her medications for the past month. While he observed that Ms. Philipina's mood was "not good" and her affect labile, he again found that she was alert and oriented; that her thoughts were linear, logical, normally productive and concrete (although with a poverty of contents); she had good eye contact, regular speech rate and rhythm, and normal psychomotor activity; adequate insight, judgment and impulse control; and that she had no abnormal mannerisms or movements. *Id*. at 615.

The following month, during a February 7, 2013 visit with Dr. Afroz, Ms. Philipina stated that she had been compliant with her medications, but that she was hearing more voices and hitting herself. *Id*. at 618. However, she reported no other psychotic symptoms, manic symptoms, or anxiety attacks and noted good sleep, normal appetite, energy and self-care. She stated that she spent time with her grandchildren and went out for walks and to the mall with her husband. She also noted going to see a movie, but said that she felt uncomfortable. Dr. Afroz noted much improved hygiene and grooming. He again documented that Ms. Philipina was alert and oriented, cooperative and in no apparent distress. He noted that her mood is "not so good," that her affect was congruent, and that her thought process was rambling, but generally coherent and relevant in contents. He further found that Ms. Philipina had good eye contact, normal speech rate and rhythm, normal psychomotor activity, adequate insight, judgment and impulse control, and no overt psychotic symptoms, no abnormal movements or mannerisms, and no suicidal or homicidal ideations. *Id*. at 618.

In a subsequent visit on March 4, 2013, Dr. Afroz noted that Ms. Philipina's medication compliance had improved, but she reported feeling increasingly depressed and anxious and stated that she was hearing voices. She added that she felt distressed by her diagnosis of liver cirrhosis. Dr. Afroz noted that Ms. Philipina's mood was "not good" and her affect labile. While he observed that her speech was "loud," he also found that Ms. Philipina spoke at a regular rate and rhythm. He again noted that she was alert and oriented and in no apparent distress; had good eye contact and adequate insight, judgment and impulse control; her thoughts were linear, concrete, normally productive and relevant in contents; and that she had no overt active psychotic symptoms, no abnormal mannerisms or involuntary movements, no gross cognitive deficits, and no suicidal or homicidal ideations. *Id*. at 620.

When Ms. Philipina returned to see Dr. Afroz on April 22, 2013, she reported that she stopped taking Risperdal, complaining that it increased the voices in her head. She noted that her daughter helped her with activities of daily living and that she had disturbed sleep, fair appetite and low energy. She complained of some depression, but otherwise denied acting out, and further denied drug or alcohol abuse for a year. Dr. Afroz again noted that Ms. Philipina's speech was "loud," but that she spoke at a regular rate and rhythm; she was alert, oriented and cooperative and in no apparent distress; had good eye contact, normal psychomotor activity, and adequate insight, judgment and impulse control; her thoughts were linear, concrete, productive and relevant; and she had no gross cognitive deficits, no overt active psychotic symptoms, no abnormal movements or mannerisms, and no suicidal or homicidal ideations. *Id*. at 622.

During a May 9, 2013 visit with Ms. Liang, Ms. Philipina reported being on Zyprexa, which she found helpful with her voices, although she believed it caused her to feel hungrier, and she stated that she was feeling moody. She complained of ongoing paranoia, stating that she was afraid to go out alone because she gets easily confused and gets lost on the bus. Nevertheless, Ms. Philipina noted that she was eating less and choosing healthier foods because her doctors advised her to lose weight, and she was going out for walks with her husband in the evenings. She also denied any visual hallucinations or delusions. Ms. Liang observed that Ms. Philipina was alert and coherent with an "okay" mood and stable affect. *Id*. at 629. And in a follow-up visit on May

29, 2013, Ms. Philipina reported feeling good because she recently found housing and felt happy to have the support of her family, but stated that she continued to feel anxious that something bad would happen to cause her to lose her new home. *Id*. at 630.

During a July 26, 2013 visit with Ms. Liang, Ms. Philipina reported feeling depressed due to her medical issues and because her request for SSI was denied. She also reported ongoing stress due to her children's legal problems. *Id*. at 632. In a subsequent visit on August 9, 2013, Ms. Philipina reported feeling better, stating that she was compliant with her medications and continued to hear voices, but not as loud as in the past. While she also reported seeing shadows flying around at night and ongoing paranoia, she denied current delusions, hostility or aggressive behaviors. *Id*. at 633.

The record indicates that between January 2013 and July 2013, Ms. Philipina missed nine appointments scheduled with Dr. Afroz or Ms. Liang. *Id*. at 593-602. In an October 3, 2013 medication management visit with Dr. Afroz, Ms. Philipina reported continued depression and insomnia, but stated that she felt better because the voices had decreased. She reported no other psychotic symptoms, mood swings, or mania. Dr. Afroz noted that Ms. Philipina stated she was eating more and gaining weight, had normal energy and self-care, and denied drug or alcohol abuse for the past 18 months. Dr. Afroz observed that her hygiene and grooming were good; that she was alert, oriented, cooperative and in no apparent distress; her thoughts were linear, concrete, normally productive and relevant in contents; and that she had good eye contact, normal psychomotor activity, no overt active psychotic symptoms, no gross cognitive deficits, and no abnormal movements or mannerisms. *Id*. at 638.

### 7.     Examining Psychologist Dr. Gerardine Gauch, Psy.D.

Meanwhile, on September 29, 2012, Ms. Philipina presented for a psychological evaluation by Dr. Gerardine Gauch. AR 465-471. She reported childhood mental and verbal abuse, as well as continued paranoia around people and anxiety attacks. Dr. Gauch noted that Ms. Philipina's mood was dysthymic and her affect was constricted. Nevertheless, Dr. Gauch also found that Ms. Philipina was cooperative and had good eye contact. She spoke at a normal volume and velocity, and her speech was logical, coherent, concise, and clearly articulated. Further, Dr. Gauch

13

remarked that Ms. Philipina's thought content was appropriate and that there were no indications of hallucinations or delusions. Ms. Philipina was found to be of average intelligence, and her fund of knowledge was consistent with her education level and socioeconomic/cultural background. She could spell the word "would" forward and backward, had limited abstract thinking, as well as mild limits in insight and judgment. Ms. Philipina reported that she typically woke up at 7 a.m. and went to bed at 9 p.m. She stated that she did chores, including sweeping, mopping and washing dishes, but claimed that she could not do the grocery shopping and could only cook microwavable food. Although she stated that she cleans, bathes, and dresses herself, Ms. Philipina noted that her husband and daughter helped her comb her hair and put on and take off her socks and shoes. *Id.* at 465-469.

Dr. Gauch diagnosed Ms. Philipina with panic disorder without agoraphobia; adjustment disorder with depressed mood; and polysubstance abuse in reported early remission. Dr. Gauch further noted that Ms. Philipina appeared to respond to questions in an open and honest manner, and observed that she was willing to receive treatment and had demonstrated past compliance. Although she noted that Ms. Philipina's symptom severity for anxiety and depression was in the moderate range, Dr. Gauch assessed that there was a good possibility that her mental condition would improve within the next 12 months. Ultimately, Dr. Gauch concluded that Ms. Philipina had poor ability to understand and remember detailed instructions, but nonetheless had good ability to maintain concentration and attention; was capable of managing her own funds; and had fair ability to understand/remember very short simple instructions; accept instructions from a supervisor; sustain an ordinary routine without special supervision; complete a normal workday and workweek without interruptions at a constant pace; interact with co-workers; and deal with various changes in the workplace. Dr. Gauch noted that the likelihood of Ms. Philipina emotionally deteriorating in the workplace was low. *Id.* at 470-471.

### 8.     Examining Psychologist Sara Boyd, Psy.D.

Approximately nine months later, on June 13, 2013, Ms. Philipina presented for a psychological examination by Dr. Sara Boyd. Ms. Philipina took the bus to this appointment and reported getting lost, but nonetheless arrived on time. She stated that she suffered from symptoms

that she claimed had gotten worse over the past year. She reported an "unstable childhood" and hearing voices. Ms. Philipina also reported symptoms of obsessive-compulsive disorder, noting that she often has to check the windows at night to make sure they are locked; fear of being around people; and insomnia. She stated that she was able to care for some of her own basic hygiene and grooming needs; could sometimes dress herself; was able to perform light household chores for a few minutes at a time; and could walk for about 10 minutes before needing to rest. But she stated that her husband and daughter help her with things like paperwork and finances. *Id.* at 524.

During the interview, Ms. Philipina was observed muttering to herself, reportedly in an attempt to quiet the voices. *Id.* Additionally, Dr. Boyd noted that Ms. Philipina appeared somewhat anxious, displayed a head-shaking tic, whispered and muttered under her breath, and turned quickly to the side and looked out the window. Nevertheless, Ms. Philipina responded to redirection to the task at hand. *Id.* at 525. Dr. Boyd observed that Ms. Philipina was alert, oriented, respectful and cooperative; had normal posture; had logical and linear thought process and stream of mental activity; had fair ability to remember past personal events; demonstrated an understanding of her condition and the need for treatment; and demonstrated a basic ability to make realistic plans and anticipate the consequences of actions. *Id.* Ms. Philipina's test results revealed a full-scale IQ of 59, which placed her in the extremely low range of cognitive functioning. *Id.* at 526. Dr. Boyd diagnosed Ms. Philipina with mild mental retardation and noted that she presented with some symptoms of psychosis, learning disorder and anxiety. *Id.* at 527. While she displayed some paranoia and some positive symptoms, such as hearing voices, Dr. Boyd did not feel that Ms. Philipina met the full criteria for a diagnosis of schizophrenia. Dr. Boyd further noted that while Ms. Philipina had mild to severe deficits in some areas of functioning, and that the extent of permanent deficit was unknown, it was possible that Ms. Philipina's condition would improve with appropriate intervention and compliance with treatment. *Id.*

Dr. Boyd ultimately concluded that Ms. Philipina had mild impairment in her ability to understand, carry out, or remember simple one- or two-step instructions and to accept instructions and interact appropriately with supervisors, but that she otherwise had moderate to severe

15

impairments in all other categories of work-related mental activities. Dr. Boyd further noted that if Ms. Philipina's disability application was approved, then a competent payee should be appointed to manage her funds. *Id*. at 527-528.

### 9. Momentum for Mental Health

On January 9, 2015, Ms. Philipina began receiving psychiatric care at Momentum for Mental Health from Dr. Dahlia Woods, M.D. and Dr. Jeanette Bland, M.D. They diagnosed Ms. Philipina with schizoaffective disorder, post-traumatic stress disorder ("PTSD"), panic disorder with agoraphobia and polysubstance dependence. AR 402-408, 666-675.

In her initial intake interview with Dr. Woods, Ms. Philipina reported that she started Zoloft when she was depressed, but felt that it was not working any more. She complained of difficulty concentrating, difficulty sleeping for several days, and low energy for months. She further reported hypervigilance and hearing voices, but denied manic symptoms. Ms. Philipina stated that she was trying to lose weight and would exercise by walking up and down stairs, but claimed that she tired easily. Dr. Woods observed that Ms. Philipina was cooperative and polite, but had a depressed mood, and a dysphoric, tearful and anxious affect. She spoke at a "loud" volume, albeit at a regular rate and rhythm. Her cognition was intact; her thought process was linear; and her thought content revealed no suicidal or homicidal ideations or any paranoid delusions. Dr. Woods found that Ms. Philipina had fair impulse control during the interview, as well as fair insight and judgment. Dr. Woods recommended that Ms. Philipina discontinue Zoloft and start a re-trial of Celexa and Abilify. *Id*. at 403-404.

In a subsequent visit with Dr. Woods on January 30, 2015, Ms. Philipina complained that Celexa and Abilify made her "crazy," stating that she believed Celexa caused her to throw a rod from the oven when her grandchildren spilled milk. Dr. Woods advised Ms. Philipina that medications do "not work[] that way," but Ms. Philipina was unwilling to continue taking Celexa. Instead, she requested Xanax to help her sleep and declined to take any more antidepressant medications until Dr. Woods ordered records from Dr. da Silveira and Ms. Philipina had an opportunity to follow up with him about what medication she would be taking for a year. Ms. Philipina otherwise reported that her depression was "8/10" and that her anxiety was "7/10," and

she complained of little sleep, nightmares, and paranoia that "comes and goes." Dr. Woods observed that Ms. Philipina was cooperative and polite, but had a depressed mood and an anxious affect. She spoke at a "loud" volume, although at a regular rate and rhythm. Her cognition was intact; her thought process was linear; and her thought content revealed no suicidal or homicidal ideations or any paranoid delusions. Ms. Philipina denied any active auditory or visual hallucinations during the interview. Dr. Woods found that Ms. Philipina had fair impulse control during the interview, as well as fair insight and judgment. Dr. Woods discontinued Celexa, increased Ms. Philipina's dose of Abilify and recommended that Ms. Philipina have one-on-one therapy. *Id*. at 405-406.

On March 23, 2015, Dr. Woods completed a medical source statement regarding Ms. Philipina's mental RFC in which she noted that Ms. Philipina had not been consistently showing up for appointments, stated that Ms. Philipina needed reminders, and found that she had moderate to marked limitations in her ability to complete work-related mental activities. *Id*. at 385-389.

The record indicates that Dr. Woods subsequently met with Ms. Philipina on July 27, 2015. Ms. Philipina stated that she had been in "crisis" due to her children's legal issues and her son's attempted suicide in jail. Ms. Philipina acknowledged passive suicidal ideations, noting that she heard voices daily telling her to hurt herself; but she denied any current suicidal plans, noting that "she is strong and can help motivate her son." She otherwise complained of sleeplessness and exhaustion and of feeling "overwhelmed, worn out, scared, and panicky." Dr. Woods noted good compliance with medications and no reported side effects. She observed that Ms. Philipina was cooperative and polite, and she spoke at a regular rhythm, rate and volume. She had a depressed mood and a labile and anxious affect. Her cognition was intact; her thought process was linear; and her thought content revealed no current suicidal or homicidal ideations or any paranoid delusions. Ms. Philipina denied any visual hallucinations. Dr. Woods found that Ms. Philipina had fair impulse control during the interview, as well as fair insight and judgment. She again increased Ms. Philipina's dose of Abilify, but decreased the dose of hydroxyzine, and started Ms. Philipina on Lexapro. Dr. Woods also requested Ms. Philipina's records from Dr. da Silveira. *Id*. at 666-667.

On November 10, 2015, Ms. Philipina saw Dr. Bland and reported severe insomnia.  Ms. Philipina felt the hydroxyzine did not help her sleep.  She also stated that she stopped taking Lexapro after a few weeks because she felt it increased her anger and agitation.  Dr. Bland remarked that Ms. Philipina was upset by being out of her medications, but also noted that Ms. Philipina had missed some appointments.  Ms. Philipina reported symptoms of tiredness, anhedonia, lack of motivation, decreased libido, poor concentration and increased worrying.  She stated that her eating had increased, even though she sometimes had no appetite.  Ms. Philipina further noted paranoia and hearing voices, and stated that she would sometimes scream and yell at people on the street for unknown reasons.  Dr. Bland observed that Ms. Philipina's mood was "ok" and that her affect was appropriate, sad and anxious.  Although Dr. Bland remarked that Ms. Philipina was cooperative and spoke at a regular rate and rhythm, Dr. Bland also observed that Ms. Philipina was agitated.  Dr. Bland documented that Ms. Philipina cried and rocked during the session, but also noted no abnormal movements, stating that Ms. Philipina "could stop the rocking."  *Id*. at 668.  Ms. Philipina's thought process was linear and goal-directed, and her thought contents did not reveal suicidal or homicidal ideation, paranoia or auditory hallucinations.  Dr. Bland determined that her insight and judgment were fair.  She also noted that Ms. Philipina appeared "desperate" during the session when it appeared that her non-narcotic medications were not working.  Because Ms. Philipina raised the subject of Klonopin, Dr. Bland believed that she was requesting a prescription for benzodiazepines; but, in view of Ms. Philipina's history of substance abuse, Dr. Bland recommended against the use of such medications and suggested that she instead start Remeron.  *Id*. at 668-669.

A week later, on November 17, 2015, Ms. Philipina called the Momentum Health office and reported that Remeron was not helping her sleep.  She was advised to increase her dose to two tablets.  *Id*. at 671.

On December 8, 2015, Ms. Philipina met with Dr. Bland for a follow-up appointment, complaining of severe insomnia.  Ms. Philipina stated that she stopped taking Remeron a few days beforehand because she felt that the increased dose was not helping her sleep; she reported that she was now experiencing flu-like symptoms.  Noting the stressor of her children's ongoing legal

18

problems, Ms. Philipina stated that she felt severe irritability and increased anger that could result in yelling and screaming. She said she continued to hear voices, but denied suicidal ideation, stating that she would not do that to her grandchildren. Ms. Philipina also reported symptoms of fatigue, lack of motivation, poor concentration (which she felt caused her to have poor memory), increased worrying and periodic anorexia. Ms. Philipina said that she isolated herself and tried to comfort herself by rocking. She noted continued paranoia; said that she yelled and screamed at people on the street unprovoked; and felt feelings of helplessness, hopelessness, and occasional guilt about her parenting of her children. Dr. Bland noted that Ms. Philipina was cooperative, but also agitated and tearful, and slightly rocked during the session. She spoke at a regular rate and rhythm. Her thought process was linear and goal-oriented. While her thought content demonstrated no suicidal or homicidal ideation, it revealed paranoia and auditory hallucinations. Dr. Bland noted that Ms. Philipina's insight and judgment were fair and that she had no abnormal movements. Dr. Bland posited that Ms. Philipina was probably experiencing some withdrawal symptoms after stopping Remeron. She again declined to prescribe any benzodiazepines, but increased Ms. Philipina's dose of Abilify, and suggested that she try Ambien. *Id*. at 672-673.

Ms. Philipina missed an appointment on January 5, 2016, and met with Dr. Bland on March 22, 2016 for a follow-up session. Ms. Philipina reported that the Ambien stopped working after three weeks and complained of frustration from her inability to sleep. After Ms. Philipina called the clinic to complain that the increased dose of Abilify was causing agitation, Ms. Philipina reported that she found Abilify helpful after her prescription was decreased to the original dose. Ms. Philipina also reported depression; poor concentration; helplessness; varied appetite; irritability; increased anger that could result in yelling and screaming; anxiety attacks; paranoia; and hearing voices. She stated that she yelled and screamed at people on the street for no reason and felt embarrassed by that behavior. Dr. Bland observed that Ms. Philipina was cooperative, but stressed, with a sad and anxious affect; spoke at a regular rate and rhythm; had fair insight and judgment; had logical, linear and goal-directed thought processes; had thought contents that revealed paranoia and auditory hallucinations, but no suicidal or homicidal ideations; and had no abnormal movement. Dr. Bland noted that Ms. Philipina failed trials of Lexapro and

19

Remeron, but would benefit from an antidepressant. She recommended that Ms. Philipina try Prozac for depression and anxiety and Trazadone for insomnia and that she continue with the original dose of Abilify. *Id*. at 675-676.

And as discussed more fully below, on June 7, 2016, Dr. Bland completed a medical source statement, essentially opining that Ms. Philipina's mental impairments preclude her ability to do any work. *Id*. at 679-685.

### 10. Nonexamining Consultant Tawnya Brode, Psy.D.

In a November 2012 report based on a review of Ms. Philipina's records, psychologist Dr. Brode noted severe affective disorders and nonsevere chronic liver disease, but found that she had no restrictions in her activities of daily living, mild limitations in social functioning, moderate limitations in maintaining concentration, persistence, or pace, and no repeated episodes of decompensation of extended duration. Dr. Brode further found that Ms. Philipina had moderate limitations in her abilities to remember, understand and carry out detailed instructions; maintain attention and concentration for extended periods; and complete a normal workday and workweek without interruptions from psychologically-based symptoms and perform at a consistent pace without an unreasonable number and length of rest periods. Dr. Brode concluded that Ms. Philipina was otherwise not significantly limited in the areas of memory and understanding, sustained concentration and persistence, social interaction and adaptation. *Id*. at 131-135.

### 11. Nonexamining Consultant Dr. D. Funkenstein, M.D.

In a July 2013 report based on a review of Ms. Philipina's records, psychiatrist Dr. Funkenstein noted a nonsevere impairment for Drugs, Substance Addiction Disorders, as well as the following severe impairments: Organic Mental Disorders, Personality Disorders, Affective Disorders, Other and Unspecified Arthropathies and Chronic Liver Disease. Dr. Funkenstein found that Ms. Philipina had no limitations in her activities of daily living, mild limitations in social functioning, moderate limitations in maintaining concentration, persistence or pace, and no repeated episodes of decompensation of extended duration. Dr. Funkenstein concluded that Ms. Philipina had moderate limitations in her abilities to understand, remember and carry out detailed instructions; maintain attention and concentration for extended periods; and complete a normal

workday and workweek without interruptions from psychologically-based symptoms and perform at a consistent pace without an unreasonable number and length of rest periods. Dr. Funkenstein otherwise concluded that Ms. Philipina either was not significantly limited or had no limitations in the areas of memory and understanding, sustained concentration and persistence, social interaction, and adaptation. *Id*. at 151-152, 155-156.

### 12. Testifying Medical Expert Dr. Robert Cohen, M.D.[4]

The ALJ held two hearings: the first on April 17, 2014 and, following remand from the Appeals Council, the second on July 11, 2016. Dr. Robert Cohen, who is board-certified in psychiatry, testified at both proceedings.

At the July 11, 2016 hearing, Dr. Cohen testified that based on his review of Ms. Philipina's records, he believes she may have a learning disability, but that her level of adaptive functioning is "too good to be at the level of mild mental retardation." *Id*. at 96. He diagnosed depression with some psychotic features and found that Ms. Philipina is mildly to moderately impaired in activities of daily living and moderately impaired in social functioning. Although Dr. Cohen noted some issues with concentration, he concluded that Ms. Philipina has the ability to attend to and concentrate on tasks; keep track of conversations and respond appropriately; that her vocabulary and grammar were good; and that she had no significant lacunar deficits in her memory. He testified that Ms. Philipina can perform work that is limited to simple, repetitive tasks, no public interaction, and only occasional contact with co-workers and supervisors. *Id*. at 96-98.

### B. Administrative Proceedings

On May 31, 2012, Ms. Philipina applied for SSI, alleging disability beginning August 30, 2011 due to depression, anxiety, arthritis in her hand and neck, and memory loss. *Id*. at 290-98, 321. The Commissioner denied her application initially and on reconsideration, and Ms. Philipina requested a hearing with an ALJ. *Id*. at 185-189, 193-200. ALJ Regina L. Sleater conducted a

---

[4] The record indicates that Dr. Cohen was misidentified as "Dr. Cullin" in the transcript of the April 17, 2014 hearing. AR 49, 81, 686.

hearing on April 17, 2014. *Id*. at 48-79. Ms. Philipina testified at that hearing, as did medical expert Dr. Richard Cohen and vocational expert Ms. McCreary.[5]  On September 24, 2014, the ALJ issued a decision concluding that Ms. Philipina was not disabled within the meaning of the Act. *Id*. at 160-174.

On March 14, 2016, the Appeals Council granted Ms. Philipina's request for review and remanded the matter to the ALJ. *Id*. at 179-183.  On remand, the ALJ was directed to (1) review Ms. Philipina's earnings for 2013 through 2015 to determine if they rise to the level of substantial gainful activity; (2) further evaluate Ms. Philipina's mental impairments in accordance with 20 C.F.R. § 416.920a; (3) give further consideration to Ms. Philipina's maximum RFC during the entire period at issue, with specific references to evidence of record; and (4) obtain evidence from a medical expert to clarify the nature and severity of Ms. Philipina's impairments.  *Id*. at 182-183.

On remand, ALJ Sleater held a hearing on July 11, 2016, at which Ms. Philipina, Dr. Cohen and Ms. McCreary again testified.  *Id*. at 80-118.

On January 13, 2017, the ALJ issued a decision concluding that Ms. Philipina is not disabled under the Act.  *Id*. at 23-42.  At step one of the sequential analysis, the ALJ found that Ms. Philipina engaged in substantial gainful activity since submitting her application for SSI.  *Id*. at 26.  Although the ALJ noted that this finding would otherwise end the five-step inquiry, she proceeded through the subsequent steps in the evaluation process.  At step two, the ALJ found that Ms. Philipina has the following severe impairments:  obesity, hepatitis C with cirrhosis, chronic liver disease with abnormal liver function tests, arthritis, mood disorder, an anxiety disorder, and a history of methamphetamine and alcohol abuse in self-reported remission.  *Id*. at 27; 20 C.F.R. § 416.920(c).  However, at step three, the ALJ concluded that Ms. Philipina did not have an impairment or combination of impairments that meets or medically equals the severity of one of the impairments listed in 20 C.F.R. Part 404, Subpart P, Appendix 1, 20 C.F.R. §§ 416.920(d), 416.925, 416.926.  At step four, the ALJ found that Ms. Philipina has the RFC to perform light

---

[5] Although the record suggests that the same vocational expert testified at both hearings, the vocational expert is identified both as "Ms. MacQuarie" and "Ms. McCreary."  The Court will refer to the vocational expert as Ms. McCreary, as reflected in the most recent hearing transcript. AR 49, 81, 110-111.

work, as defined in 20 C.F.R. § 416.967(b), subject to the limitations that she could have only

occasional superficial contact with co-workers;[6] regular, but only occasional contact with

supervisors; no interaction with the public; and would be limited to simple jobs involving simple,

repetitive tasks. AR 29. The ALJ further found that Ms. Philipina could not perform her past

relevant work as a babysitter. *Id*. at 40. Nonetheless, at step five of the sequential analysis, the

ALJ concluded that Ms. Philipina could perform other jobs that exist in substantial numbers in the

national economy and that she therefore is not disabled. *Id* at 41.

     The Appeals Council denied Ms. Philipina's request for review, and the ALJ's January 13,

2017 decision became the Commissioner's final decision. Ms. Philipina now seeks judicial

review, arguing that the ALJ erred in two respects. First, she contends that the ALJ's

determination that she engaged in substantial gainful activity is not supported by substantial

evidence. Second, Ms. Philipina argues that in assessing her RFC, the ALJ improperly rejected

the opinion of Dr. Bland, who essentially opined that Ms. Philipina's mental conditions preclude

her performing any work activities. Relatedly, Ms. Philipina argues that the ALJ erred in

discounting Dr. Boyd's opinion, which she contends is consistent with that of Dr. Bland. The

Commissioner contends that the ALJ's decision is correct and free of legal error.

### III.    STANDARD OF REVIEW

     Pursuant to 42 U.S.C. § 405(g), this Court has the authority to review the Commissioner's

decision to deny benefits. The Commissioner's decision will be disturbed only if it is not

supported by substantial evidence or if it is based upon the application of improper legal

standards. *Morgan v. Comm'r of Soc. Sec. Admin.*, 169 F.3d 595, 599 (9th Cir. 1999); *Moncada v.

Chater*, 60 F.3d 521, 523 (9th Cir. 1995). In this context, the term "substantial evidence" means

"more than a mere scintilla but less than a preponderance—it is such relevant evidence that a

reasonable mind might accept as adequate to support the conclusion." *Moncada*, 60 F.3d at 523;

*see also Drouin v. Sullivan*, 966 F.2d 1255, 1257 (9th Cir. 1992). When determining whether

---

[6] By "occasional superficial contact with co-workers," the ALJ apparently meant that Ms.
Philipina could work in proximity to other co-workers and exchange brief greetings with them, but
could not work with co-workers on projects or tasks. AR 29.

substantial evidence exists to support the Commissioner's decision, the Court examines the administrative record as a whole, considering adverse as well as supporting evidence. *Drouin*, 966 F.2d at 1257*; Hammock v. Bowen*, 879 F.2d 498, 501 (9th Cir. 1989). Where evidence exists to support more than one rational interpretation, the Court must defer to the decision of the Commissioner. *Moncada*, 60 F.3d at 523; *Drouin*, 966 F.2d at 1258.

## IV.    DISCUSSION

### A.    Whether the ALJ erred in determining that Ms. Philipina engaged in substantial gainful activity

At step one of the sequential analysis, the ALJ found that Ms. Philipina was not entitled to benefits because she had engaged in substantial gainful activity since filing her application for SSI. If Ms. Philipina engaged in substantial gainful activity, then she cannot be found disabled, no matter what her medical condition, age, education, or work experience. 20 C.F.R. § 416.920(b). The activity must be both substantial and gainful. "Substantial work activity is work activity that involves doing significant physical or mental activities." *Id.* § 416.972(a). Work may be found substantial even if it is done on a part-time basis. *Id*; *Katz v. Sec'y of Health & Human Servs.*, 972 F.2d 290, 292 (9th Cir. 1992) (citing *Keyes v. Sullivan*, 894 F.2d 1053, 1056 (9th Cir. 1990)). "Gainful work activity is work activity that [a claimant] do[es] for pay or profit." 20 C.F.R. § 416.972(b). "Work activity is gainful if it is the kind of work usually done for pay or profit, whether or not a profit is realized." *Id.*; *see also Corrao v. Shalala*, 20 F.3d 943, 946 (9th Cir. 1994) (same).

There is a presumption of substantial gainful activity if a claimant earns more than the amounts specified in the Social Security guidelines. *Keyes*, 894 F.3d at 1056; *see also* 20 C.F.R. § 416.974(a)(1) ("Generally, in evaluating your work activity for substantial gainful activity purposes, our primary consideration will be the earnings you derive from the work activity."). "The mere existence of earnings over the statutory minimum is not dispositive." *Keyes*, 894 F.2d at 1056. Instead, "[t]he presumption is rebuttable by the claimant." *Corrao*, 20 F.3d at 948. Factors to be considered in determining whether the presumption is rebutted include "the responsibilities and skills required to perform the work, the amount of time the individual spends

working, the quality of the individual's work, special working conditions, and for individuals who are self-employed, the value of their work to the business." *Id.*; *see also Keyes*, 894 F.2d at 1056 ("The claimant may rebut a presumption based on earnings with evidence of his inability to be self-employed or to perform the job well, without special assistance, or for only brief periods of time.").

In the present case, the ALJ reviewed Ms. Philipina's earning reports, tax documents and testimony. AR 26. There is no dispute that Ms. Philipina's earnings, all of which are designated as "self-employment," show that she was paid $12,506 in 2012; $14,634 in 2013; $14,188.00 in 2014; and $14,111 in 2015. AR 26, 313-314, 315. For each year, Ms. Philipina's monthly earnings were equivalent to $1,042.17 in 2012; $1,219.50 in 2013; $1,182.33 in 2014; and $1,175.92 in 2015. These amounts indisputably exceed the Social Security Administration's designated monthly substantial gainful activity amounts for each of those years: $1,010 in 2012; $1,040 in 2013; $1,070 in 2014 and $1,090 in 2015. *See* https://www.ssa.gov/oact/cola/sga.html. Thus, the amount of Ms. Philipina's earnings give rise to a presumption of substantial gainful activity. *Keyes*, 894 F.3d at 1056; *see also* 20 C.F.R. § 416.974(a)(1).

Ms. Philipina contends that she rebutted the presumption by establishing that at least a portion of her income constituted welfare payments. She testified at the second administrative hearing that she received payments of $788.00 per month through a CalWorks program called Aid to Families with Dependent Children ("AFDC"), which was the equivalent of the federal Temporary Assistance to Needy Families ("TANF") welfare program. AR 84-86. She further testified that she received these payments as a form of welfare, because she had temporary custody of her grandchildren while her daughter was in custody. *Id.* Following that hearing, Ms. Philipina submitted documentation confirming the $788.00 she received per month through this program. *Id.* at 430-431.

The ALJ acknowledged that TANF payments generally are not considered income for purposes of determining whether Ms. Philipina engaged in substantial gainful activity. *Id.* at 26. Nevertheless, she concluded that Ms. Philipina failed to carry her burden at step one of establishing her entitlement to benefits, based on the differences between Ms. Philipina's reported

"self-employment" income and her AFDC payments for the years in question. Noting that Ms. Philipina's AFDC payments accounted for only $9,456.00 of her reported annual income from "self-employment," the ALJ reasoned:

> The claimant's brief fails to explain why these earnings are reported as self-employment earnings and fails to identify the source of this additional income in excess of $9,456 a year (B18E). During her testimony, claimant provided no explanation for monies other than CalWORKS and admitted to no self-employment. It is possible that the claimant is receiving income from self-employment in addition to these CalWORKS payments. In light of this information, the undersigned, the undersigned [sic] has determined that the claimant has not sustained the burden of proving entitlement to benefits at this step in the decision process.

*Id.*

If Ms. Philipina's AFDC payments are excluded from her reported annual income, there appears to be no dispute that her relevant income for substantial gainful activity purposes was $3,050 in 2012 ($254.17 per month); $5,178 in 2013 ($431.50 per month); $4,732 in 2014 ($394.33 per month); and $4,655 in 2015 ($387.92 per month). Although these monthly amounts do not exceed the Social Security Administration's minimum monthly substantial gainful activity amounts, work may be substantial and gainful, even if it is done on a part-time basis, and without regard to whether a profit is realized. 20 C.F.R. § 416.972(a), (b); *Corrao,* 20 F.3d at 946. And while Ms. Philipina offered no evidence or explanation for her monthly income amounts beyond her AFDC welfare payments, *Corrao* indicates that the agency's guidelines "do not relieve an ALJ of the duty to develop the record fully and fairly." 20 F.3d at 948 (internal quotations and citation omitted). "For activity to constitute [substantial gainful activity], it still must involve 'significant physical or mental activities' and must be the type of work usually done for pay or profit." *Id.* (quoting 20 C.F.R. §§ 416.972(a) & (b)). Here, the ALJ appeared to rely on the agency's guidelines, but simply noted the possibility that Ms. Philipina is receiving income from self-employment in addition to her AFDC payments. AR 26. The ALJ did not inquire about the difference between Ms. Philipina's AFDC payments and her remaining reported income, or about the activities underlying that remaining income. Accordingly, the Court cannot conclude that substantial evidence supports the ALJ's finding that Ms. Philipina engaged in substantial gainful

activity. *Cf. Hart v. Sullivan*, 824 F. Supp. 903, 907 (N.D. Cal. 1992) (concluding that the ALJ fully and fairly developed the record where the ALJ relied not only on the agency's guidelines, but also on the claimant's work activities, in concluding that the claimant engaged in substantial gainful activity).

On this issue, Ms. Philipina's motion for summary judgment is granted, the Commissioner's cross-motion for summary judgment is denied, and this matter should be remanded for further development of the factual record.

The Commissioner argues that any error at this step is harmless because the ALJ proceeded through the sequential analysis and properly determined that Ms. Philipina is not disabled. However, for the reasons discussed below, the Court finds that the ALJ did not provide legally sufficient reasons supported by substantial evidence for discounting the opinions of Drs. Bland and Boyd.

**B. Whether the ALJ properly rejected Dr. Bland's opinion[7]**

Psychiatrist Dr. Bland treated Ms. Philipina several times between November 2015 and June 7, 2016, when she issued a medical source statement, opining that Ms. Philipina's mental condition precludes her ability to work.[8] AR 668, 671, 672, 675, 679-685. Specifically, Dr. Bland diagnosed Ms. Philipina with schizoaffective disorder, PTSD, and polysubstance abuse in remission. *Id*. at 685. She observed that Ms. Philipina requires reminders to keep appointments and described her condition as "[a]nxious and frustrated[,] regular insomnia[,] tearful, rocks in chair, hands over face[,] sad affect[,] mood 'bad.'" *Id*. at 682-683. Although Dr. Bland did not respond to questions asking her to describe Ms. Philipina's intellectual functioning/sensorium and

---

[7] Ms. Philipina does not raise any issue with respect to the opinions of examining physicians Drs. Tang and Masood, who made findings about her physical RFC. And, no one, including the ALJ, has said anything about the Physical RFC Questionnaire Dr. Nguyen issued in April 2015. Accordingly, the Court expresses no opinion about those matters here.

[8] There is some ambiguity in the record as to a portion of Dr. Bland's statement. In parts of the questionnaire that asked Dr. Bland to check boxes describing Ms. Philipina's restrictions for certain work-related mental activities, Dr. Bland checked boxes stating "None" for every listed activity. AR 679-680. Those responses might indicate that Dr. Bland found that Ms. Philipina had no functional restrictions precluding her ability to work. However, Dr. Bland's remarks in other portions of her statement suggest that her view is that Ms. Philipina is unable to work at all. And indeed, that is how the ALJ construed Dr. Bland's statement.

noted that Ms. Philipina did not have suicidal or homicidal ideations, she stated that Ms.

Philipina's affective status was "insomnia, anhedonia, [increased] guilt, decreased energy, [and]

unable to concentrate." *Id*. at 683. Dr. Bland further noted "emotional lability [and] agitation"

and stated that Ms. Philipina "needs help from daughter to perform basic chores, paranoia, +

auditory hallucinations." *Id*. Additionally, Dr. Bland noted that Ms. Philipina is competent to

manage her own funds, but remarked that she screams and yells at her family members," "cannot

focus attention," and "is not likely to improve as she is not responding to current medications."

*Id*. at 684-685.

In assessing Ms. Philipina's RFC, the ALJ gave "limited weight" to Dr. Bland's opinion,

while giving "great" or "significant" weight to the opinions of Dr. Cohen and most of the

examining and nonexamining consultants. Ms. Philipina's primary contention is that the ALJ did

not provide sufficient reasons for giving Dr. Cohen's opinion substantially more weight than was

given to that of Dr. Bland. Relatedly, she argues that the ALJ erred insofar as she discounted Dr.

Bland's opinion, while giving "significant weight" to the opinions of examining psychologists

Drs. Marinos and Gauch and affording only "limited weight" to that of examining psychologist

Dr. Boyd. The Commissioner contends that the ALJ properly weighed the medical evidence and

gave sufficient reasons supported by substantial evidence in the record. For the reasons discussed

below, the Court agrees with Ms. Philipina.

"Cases in this circuit distinguish among the opinions of three types of physicians:

(1) those who treat the claimant (treating physicians); (2) those who examine but do not treat the

claimant (examining physicians); and (3) those who neither examine nor treat the claimant

(nonexamining physicians)." *Lester v. Chater*, 81 F.3d 821, 830 (9th Cir. 1996). "As a general

rule, more weight should be given to the opinion of a treating source than to the opinion of doctors

who do not treat the claimant." *Id*.

A treating physician's opinion is entitled to "controlling weight" if it "is well-supported by

medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the

other substantial evidence" in the record. 20 C.F.R. § 416.927(c)(2).[9] "However, '[t]he ALJ need not accept the opinion of any physician, including a treating physician, if that opinion is brief, conclusory, and inadequately supported by clinical findings.'" *Bray v. Comm'r of Social Security Admin.*, 554 F.3d 1219, 1228 (9th Cir. 2009) (quoting *Thomas v. Barnhart*, 278 F.3d 947, 957 (9th Cir. 2002)).

When an ALJ gives a treating physician's opinion less than controlling weight, the ALJ must do two things. First, the ALJ must consider several factors, including "the length of the treatment relationship and the frequency of examination, the nature and extent of the treatment relationship, supportability, consistency with the record, and specialization of the physician." *Trevizo v. Berryhill*, 871 F.3d 664, 675 (9th Cir. 2017);[10] *see also* 20 C.F.R. § 416.927(c). Consideration must also be given to other factors, whether raised by the claimant or by others, or if known to the ALJ, including the amount of relevant evidence supporting the opinion and the quality of the explanation provided; the degree of understanding a physician has of the Commissioner's disability programs and their evidentiary requirements; and the degree of his or her familiarity with other information in the case record. 20 C.F.R. § 416.927(c)(6). The failure to consider these factors, by itself, constitutes reversible error. *Trevizo,* 871 F.3d at 676.

Second, the ALJ must provide reasons for rejecting or discounting the treating physician's opinion. The legal standard that applies to the ALJ's proffered reasons depends on whether or not the treating physician's opinion is contradicted by another physician. When a treating physician's opinion is not contradicted by another physician, the ALJ must provide "clear and convincing" reasons for rejecting or discounting the opinion, supported by substantial evidence. *Trevizo*, 871 F.3d at 675. When a treating physician's opinion is contradicted by another physician, an ALJ must provide "specific and legitimate reasons" for rejecting or discounting the treating physician's

---

[9] Although the Commissioner's rules and regulations regarding the evaluation of medical evidence were revised in 2017, there appears to be no dispute that those revisions do not apply to Ms. Philipina's claims, which were filed before those revisions went into effect.

[10] Although *Trevizo* concerned an application for disability insurance benefits under Title II of the Social Security Act, in discussing the proper assessment of medical opinions, the *Trevizo* court addressed regulations that parallel those applicable to SSI applications.

United States District Court
Northern District of California

opinion, supported by substantial evidence. *Id.* "The ALJ can meet this burden by setting out a detailed and thorough summary of the facts and conflicting clinical evidence, stating his interpretation thereof, and making findings." *Magallanes v. Bowen*, 881 F.2d 747, 751 (9th Cir. 1989) (quotations and citation omitted).

Dr. Bland's opinion about Ms. Philipina's inability to work is contradicted by Dr. Cohen and other examining and nonexamining physicians, who concluded that Ms. Philipina's functional abilities are not as limited as opined by Dr. Bland. Thus, the ALJ was required to provide "specific and legitimate" reasons for discounting Dr. Bland's opinion, supported by substantial evidence. *Trevizo,* 871 F.3d at 675.

In assessing Dr. Bland's opinion, the ALJ considered the requisite factors under 20 C.F.R. § 416.927(c), including Dr. Bland's treatment relationship, specialization, her familiarity with Ms. Philipina's treatment history, and the supportability and consistency of Dr. Bland's opinion. AR 35, 37. She nonetheless was obliged to provide good reasons for discounting Dr. Bland's opinion, supported by substantial evidence.

In evaluating the medical opinions, the ALJ began by giving Dr. Cohen's opinion and testimony "great weight" and appeared to use Dr. Cohen's opinion, to some degree, as the yardstick by which other assessments in the record were measured. Noting that Dr. Cohen is a licensed and board-certified physician with over 30 years of clinical experience, the ALJ credited his opinion as consistent with evidence indicating that Ms. Philipina's level of functioning was higher than might be suggested by the full-scale IQ scores of 50 and 59 in the record, including that she acknowledged abilities to care for some of her personal and household needs; took care of her grandchildren with her husband; was able to use public transportation; and could prepare simple meals, attend doctors' appointments, remember past personal events, and be redirected to tasks. *Id.* at 36 (citing AR 466-469, 472-473, 525-526, 612, 622, 638, 666-675). Further, the ALJ explained that "[u]nlike the other assessments of record, as described below, Dr. Cohen's opinion was provided after a review of the claimant's complete treatment record and hearing testimony; therefore, his opinion incorporates a more thorough view of the claimant's longitudinal treatment history." *Id.* at 36-37.

While the ALJ recognized that Dr. Bland was Ms. Philipina's treating psychiatrist, she discounted Dr. Bland's opinion about Ms. Philipina's inability to work on two grounds. First, she noted that Dr. Bland "has only treated claimant since November 2015" and therefore concluded that Dr. Bland has "limited knowledge of the claimant's treatment history . . .." *Id*. at 37. Second, the ALJ concluded that Dr. Bland's opinion was inconsistent with her own treatment notes. *Id*.

With respect to the ALJ's observation that Dr. Bland had "only treated" Ms. Philipina since November 2015, the ALJ permissibly could consider whether the length of Dr. Bland's treatment, relative to Ms. Philipina's treatment history, affects the weight to be given to Dr. Bland's opinion. 20 C.F.R. § 416.927(c)(2)(i) ("Generally, the longer a treating source has treated you and the more times you have been seen by a treating source, the more weight we will give to the source's medical opinion. When the treating source has seen you a number of times and long enough to have obtained a longitudinal picture of your impairment, we will give the medical source's medical opinion more weight than we would give it if it were from a nontreating source."). Even so, Dr. Bland's treatment records and Medical Source Statement are the most recent reports in the record. *See Orn v. Astrue*, 495 F.3d 625, 633-34 (9th Cir. 2007) (stating that the opinion of the plaintiff's treating physician had added significance due, in part, to the fact that it was the most recent report in the record). Moreover, Dr. Cohen testified that he believed his diagnosis of depression with psychotic features "is really close" to Dr. Bland's diagnosis of schizoaffective disorder. AR 98. In discounting the weight given to Dr. Bland's opinion, the ALJ provides no explanation why, over the course of seven months and several treatment sessions, Dr. Bland could not have made an accurate assessment of Ms. Philipina's mental impairments and their impact on her ability to work, relative to Dr. Cohen, who did not examine or treat Ms. Philipina at all. *See generally Sprague v. Bowen*, 812 F.2d 1226, 1230 (9th Cir. 1987) ("The rationale for giving greater weight to a treating physician's opinion is that he is employed to cure and has a greater opportunity to know and observe the patient as an individual.").

Noting that the ALJ cited record evidence supporting Dr. Cohen's opinion that Ms. Philipina's level of functioning was higher than her full-scale IQ scores might suggest, the Commissioner points out that "[t]he opinions of non-treating or non-examining physicians may

also serve as substantial evidence when the opinions are consistent with independent clinical findings or other evidence in the record." *Thomas*, 278 F.3d at 957. However, the ALJ did not rely on Dr. Cohen's opinion, or the evidence in the record, regarding Ms. Philipina's adaptive functioning as a basis to discount Dr. Bland's opinion, and such *post hoc* rationalization is not permitted on review. *Bray*, 554 F.3d at 1225 ("Long-standing principles of administrative law require us to review the ALJ's decision based on the reasoning and factual findings offered by the ALJ—not *post hoc* rationalizations that attempt to intuit what the adjudicator may have been thinking."). Moreover, while the ALJ cited some evidence to support Dr. Cohen's opinion, other evidence appears consistent with Dr. Bland's opinion. For example, although the ALJ remarked that Ms. Philipina attended medical appointments independently, elsewhere in her decision, she noted that Ms. Philipina also missed appointments, a fact that is not inconsistent with Dr. Bland's opinion that Ms. Philipina required frequent reminders and support regarding her appointments. AR 34, 36.

In addition, to the short duration of the treating relationship, the ALJ discounted her assessment of Dr. Bland's opinion based on "numerous inconsistencies" (*id*. at 37) in Dr. Bland's treatment notes. She cites only two examples:

> In particular, Dr. Bland indicated that the claimant had repeated issues with treatment compliance, which made it difficult to ascertain the efficacy of her medications (B23F/5, and B23F/12-13). Dr. Bland also regularly described the claimant as cooperative and polite with no suicidal or homicidal ideation, and no paranoid delusions (B23F/3-12). This information conflicts with Dr. Bland's opinion statement wherein she described the claimant as screaming and yelling at family members and needing frequent support and reminders regarding appointments and medications (B23F/4-7). . . .

*Id*. With respect to the efficacy of Ms. Philipina's medications, the ALJ cites to treatment notes documenting Ms. Philipina's reports that she stopped taking Lexapro because she claimed it increased her anger and agitation, and also stopped taking Ambien because she said it no longer worked. *Id*. at 668, 675-676. Dr. Bland remarked that she could not "tell the efficacy of the Lexapro since [Ms. Philipina] was not on it long enough." *Id*. at 668. Statements in Dr. Bland's treatment records reasonably could be read as inconsistent with her conclusion that Ms. Philipina was unlikely to improve because Ms. Philipina was not responding to medications. *Id*. at 37, 685.

United States District Court
Northern District of California

However, neither the ALJ nor the Commissioner explain why Dr. Bland's observation that Ms. Philipina was respectful and polite during examinations is inconsistent with Dr. Bland's notes that Ms. Philipina yelled and screamed at family members and needed reminders and frequent support and reminders regarding appointments and medications. *See generally, e.g., Fillmore v. Astrue*, No. C10-03655 JCS, 2012 WL 298341, at *24 (N.D. Cal., Feb. 1, 2012) (concluding that the ALJ's findings were not supported by substantial evidence where, among other things, he failed to explain why a physician's observation that the plaintiff was "open and friendly" and "oriented as to person, place and time" was inconsistent with the physician's findings as to the plaintiff's attention and concentration). To the extent Dr. Bland's observations reflect Ms. Philipina's cooperation in treatment sessions, they are not necessarily inconsistent with how Ms. Philipina may have appeared during those sessions or how she reported she felt and behaved at other times. For example, Dr. Bland observed that although she was cooperative, Ms. Philipina was also agitated and rocked and cried during their first meeting in November 2015. AR 668. Additionally, throughout her treatment notes, Dr. Bland remarked that Ms. Philipina appeared stressed, sad, anxious and tearful, and documented Ms. Philipina's reports of severe irritability and increased anger that may cause yelling and screaming. And while Dr. Bland noted that Ms. Philipina had no abnormal movements, she documented that Ms. Philipina continued to endorse paranoia and auditory hallucinations. *Id*. at 668-678.

Ms. Philipina further contends that the ALJ erred insofar as she discounted Dr. Bland's opinion, while giving "significant weight" to the opinions of examining psychologists Drs. Marinos and Gauch, and "less weight" to that of examining psychologist Dr. Boyd, which Ms. Philipina contends is consistent with that of Dr. Bland. The Court agrees.

As between Dr. Bland and the examining providers as a whole, this Court is mindful that a number of district courts, including those within this district, have held that an examining provider's opinion cannot be rejected on the ground that the provider examined the claimant only once. *See, e.g., Sheppard v. Berryhill*, No. 17-cv-01332-JSC, 2018 WL 2183294, at *9 (N.D. Cal., May 11, 2018) (citing cases). Nevertheless, while Dr. Bland's treatment relationship was relatively short, she examined Ms. Philipina more than any of the examining providers.

Moreover, the ALJ acknowledges that, like Dr. Bland, none of the examining providers reviewed Ms. Philipina's treatment history. While the Court cannot say that the ALJ erred in relying on the duration of Dr. Bland's treatment relationship as a factor in considering the weight to give her opinion, the Court is not persuaded that Dr. Bland's relatively short treating relationship and her lack of review of Ms. Philipina's treatment records necessarily justify giving her opinion "limited weight," relative to the opinions of the examining providers.

Turning now to the specific examining providers at issue, Dr. Marinos concluded that Ms. Philipina might have difficulty on jobs requiring more than basic reading and writing skills, but she likely could remember and carry out simple instructions, maintain adequate concentration and pace for routine tasks, and interact appropriately with others. *Id*. at 438. While acknowledging that subsequent examinations noted Ms. Philipina was frequently labile and emotional, the ALJ decided to give Dr. Marinos' opinion "significant weight," in part, because Dr. Marinos observed that during her examination, Ms. Philipina was cooperative, polite, alert and oriented, and had good eye contact. *Id*. at 37.[11] For the reasons discussed above, however, the ALJ has not sufficiently explained why observations about Ms. Philipina's cooperation and demeanor during examinations necessarily conflicts with Dr. Bland's opinions about Ms. Philipina's capabilities. Notwithstanding that the ALJ noted she was interpreting Dr. Marinos' opinion "with some caution," (*id*. at 37), the ALJ's decision to give Dr. Marinos' opinion "significant weight" is especially concerning, in view of the fact that Dr. Marinos' opinion predates Ms. Philipina's alleged disability onset date and her receipt of any psychiatric treatment and admittedly was based on flawed test administration. While the ALJ also credited Dr. Marinos' opinion insofar as she found it consistent with the opinion of Dr. Gauch and with the portion of Dr. Boyd's opinion with which the ALJ apparently agreed, for the reasons discussed below, the Court finds that the ALJ did not properly weigh those opinions either.

Dr. Gauch concluded that Ms. Philipina had poor ability to understand and remember detailed instructions, but nonetheless had good ability to maintain concentration and attention; was

---

[11] Although the ALJ cited to Exhibit "B12F/19," the Court assumes that she meant Exhibit B21/19, as Exhibit B12 contains only four pages.

capable of managing her own funds; and had fair ability to understand/remember very short simple instructions; accept instructions from a supervisor; sustain an ordinary routine without special supervision; complete a normal workday and workweek without interruptions at a constant pace; interact with co-workers; and deal with various changes in the workplace. Dr. Gauch noted that the likelihood of Ms. Philipina emotionally deteriorating in the workplace was low. *Id*. at 470-471. The ALJ gave Dr. Gauch's opinion "significant weight" because she found it to be consistent with Dr. Gauch's observations during Ms. Philipina's examination and with Ms. Philipina's behaviors throughout the treatment record, including those observed by Dr. Bland. *Id*. at 38 (citing AR 435-436, 468, 606, 622, 629, 666-675). In view of Dr. Bland's treating relationship with Ms. Philipina, however, the ALJ has not provided legally sufficient reasons why she gave Dr. Bland's opinion significantly less weight than that of Dr. Gauch, particularly where, as noted above, Dr. Gauch apparently also never reviewed Ms. Philipina's treatment history.

As for Dr. Boyd, Ms. Philipina's test results revealed a full-scale IQ of 59, which placed her in the extremely low range of cognitive functioning. AR 526. Dr. Boyd diagnosed Ms. Philipina with mild mental retardation and noted that she presented with some symptoms of psychosis, learning disorder and anxiety. *Id*. at 527. She concluded that Ms. Philipina had mild impairment in her ability to understand, carry out, or remember simple one- or two-step instructions and to accept instructions and interact appropriately with supervisors, but that she otherwise had moderate to severe impairments in all other categories of work-related mental activities. Dr. Boyd further noted that if Ms. Philipina's disability application was approved, then a competent payee should be appointed to manage her funds. *Id*. at 527-528.

The ALJ gave "less weight" to Dr. Boyd's opinion and, in doing so, appeared to selectively favor Dr. Boyd's less restrictive findings, without providing legally sufficient reasons for rejecting her more restrictive limitations. The ALJ partially credited Dr. Boyd's opinion insofar as it was based "on her personal review of the claimant's mental symptoms wherein she noted that the claimant could be redirected back to tasks and the claimant demonstrated generally appropriate social behaviors." *Id*. at 38. However, the ALJ rejected Dr. Boyd's more restrictive limitations because she concluded that they were based "on observations that are not consistent

35

with the claimant's treatment record," namely, Dr. Boyd's observations that Ms. Philipina muttered to herself, shook her head and looked out the window. *Id.* The ALJ correctly noted that other treatment notes in the record indicate that Ms. Philipina had not previously exhibited such behaviors or any overt psychotic behaviors or abnormal movements during sessions. *Id.* at 38 (citing AR 468, 606, 610-612, 622, 630, 633). And some of the cited records do note improvements, primarily when Ms. Philipina reported that she found housing and was no longer homeless, and several months after Dr. Boyd's examination when Ms. Philipina reported that she continued to hear voices, but not as loud as in the past. *Id.* at 610, 630, 633. Nevertheless, the cited records do not indicate a clear trend toward improvement, and some also support Ms. Philipina's report to Dr. Boyd that her symptoms had worsened over the past year. *Id.* at 524, 612, 622. Moreover, there is nothing in Dr. Boyd's report to suggest that she based her more restrictive limitations solely on Ms. Philipina's observed behaviors and movements during the examination. Indeed, Dr. Boyd's report includes a discussion of Ms. Philipina's test results, which revealed a full-scale IQ of 59—a score that, as Dr. Boyd noted, placed Ms. Philipina "within the Extremely Low range of cognitive functioning." *Id.* at 526. And unlike Dr. Marinos, Dr. Boyd stated that Ms. Philipina "appeared to be putting forth her best effort" (*id.* at 525) and made no finding of malingering.

The Court is mindful of the difficulty presented by a record, such as this one, that contains multiple opinions from treating, examining, and non-examining physicians over a several-year period. However, as discussed above, the ALJ engaged in prohibited cherry-picking as to her evaluations of some of the medical evidence. An ALJ errs by cherry-picking portions of the medical record consistent with her findings, and assigning little weight to medical opinions that are inconsistent with those findings, without a substantive basis for such a conclusion. *See, e.g., Holohan v. Massanari*, 246 F.3d 1195, 1207-08 (9th Cir. 2001) (holding that an ALJ may not selectively rely on some entries and ignore others "that indicate continued, severe impairment"); *see also Attmore v. Colvin*, 827 F.3d 872 (9th Cir. 2016) (concluding that the ALJ was required to examine the evidence under the "broader context" of the claimant's impairments and was not permitted to "cherry-pick" among findings in the record to support a conclusion). While there

36

might be evidence in the record to support Dr. Cohen's opinion regarding his finding regarding Ms. Philipina's functionality, the ALJ was required to consider the record as a whole in assessing the weight to be afforded the different medical opinions in the record. Because the Court finds that the ALJ did not do so and did not give legally sufficient reasons for affording Dr. Bland's opinion "limited weight" relative to the opinion expressed by Dr. Cohen, or for crediting and discrediting the opinions of Drs. Marinos, Gauch and Boyd, the Court concludes that remand is required.[12]

Accordingly, on this issue, Ms. Philipina's motion for summary judgment is granted and the Commissioner's cross-motion is denied.

## V. DISPOSITION

"When the ALJ denies benefits and the court finds error, the court ordinarily must remand to the agency for further proceedings before directing an award of benefits." *Leon v. Berryhill*, 880 F.3d 1041, 1045 (9th Cir. 2017) (citing *Treichler v. Comm'r of Soc. Sec. Admin.*, 775 F.3d 1090, 1099 (9th Cir. 2014)). That is because "an ALJ's failure to provide sufficiently specific reasons for rejecting the testimony of a claimant or other witness does not, without more, require the reviewing court to credit the testimony as true." *Treichler*, 775 F.3d at 1106.

The Court may order an immediate award of benefits only if three conditions are met. First, the Court asks "whether the 'ALJ failed to provide legally sufficient reasons for rejecting evidence, whether claimant testimony or medical opinion.'" *Id.* (quoting *Garrison v. Colvin*, 759 F.3d 995, 1020 (9th Cir. 2014)). Next, the Court "determine[s] 'whether there are outstanding issues that must be resolved before a determination of disability can be made . . . . and whether further administrative proceedings would be useful.'" *Id.* (quoting *Treichler*, 775 F.3d at 1101). "When these first two conditions are satisfied, [the Court] then credit[s] the discredited testimony as true for the purpose of determining whether, on the record taken as a whole, there is no doubt as

---

[12] While the Commissioner argues that reviewing psychologist Dr. Brode and reviewing psychiatrist Dr. Funkenstein reached conclusions that also support the ALJ's decision, insofar as the ALJ credited those opinions based on their consistency with those that this Court concludes were not properly weighed relative to that of Dr. Bland (i.e., Drs. Cohen, Gauch and Boyd, AR at 39), the opinions of Drs. Brode and Funkenstein, by themselves, are not substantial evidence for discounting Dr. Bland's opinion.

United States District Court
Northern District of California

to disability." *Id.* (citing *Treichler*, 775 F.3d at 1101).  Even when all three conditions are satisfied and the evidence in question is credited as true, it is within the district court's discretion whether to make a direct award of benefits or to remand for further proceedings when the record as a whole creates serious doubt as to disability.  *Id.* at 1045.  As explained by the Ninth Circuit, "[a]n automatic award of benefits in a disability benefits case is a rare and prophylactic exception to the well-established ordinary remand rule."  *Id.* at 1044.

In the present case, the first condition is met because the Court has found that the ALJ's conclusion that Ms. Philipina engaged in substantial gainful activity is not supported by substantial evidence and that the ALJ failed to provide legally sufficient reasons for discounting the opinions of Drs. Bland and Boyd.  However, there are outstanding issues that must be resolved before a final determination can be made.  The ALJ must develop the record at step one of the sequential analysis as to Ms. Philipina's reported "self-employment" earnings that exceed the AFDC payments she received.  Depending on what further facts are revealed, the outcome may affect the determination whether Ms. Philipina is disabled.  Should the disability analysis proceed beyond step one, the ALJ must also reassess the medical opinions at issue on this appeal and provide legally adequate reasons for any portion of those opinions or statements that the ALJ discounts or rejects.

## VI.     CONCLUSION

Based on the foregoing, Ms. Philipina's motion for summary judgment is granted, the Commissioner's cross-motion for summary judgment is denied, and this matter is remanded for further proceedings consistent with this order.  The  Clerk shall enter judgment accordingly and close this file.

**IT IS SO ORDERED.**

Dated:  March 31, 2019

VIRGINIA K. DEMARCHI
United States Magistrate Judge